[Cite as *Greig v. Wallick*, 2012-Ohio-77.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT


|  |  |  |
|---|---|---|
| | : | JUDGES: |
| GARY L. GREIG | : | W. Scott Gwin, P.J. |
| | : | John W. Wise, J. |
| Plaintiff-Appellee | : | Julie A. Edwards, J. |
| | : | |
| -vs- | : | Case No. 2010AP090036 |
| | : | |
| | : | |
| WILLIAM C. WALLICK | : | O P I N I O N |
| Defendant-Appellant | | |


CHARACTER OF PROCEEDING:     Civil Appeal from Tuscarawas County
Court of Common Pleas Case No.
2009CV040307

JUDGMENT:     Affirmed In Part and Reversed and
Remanded In Part

DATE OF JUDGMENT ENTRY:     January 10, 2012

APPEARANCES:

For Plaintiff-Appellee     For Defendant-Appellant

TZANGAS, PLAKAS, MANNOS &     RICHARD W. HINIG
RAIES, LTD     217 N. Broadway
James M. McHugh     New Philadelphia, Ohio  44663
Megan J. Frantz
220 Market Ave., South
Eighth Floor
Canton, Ohio  44702

*Edwards, J.*

{¶1}  Defendant-appellant William Wallick appeals from the August 24, 2010 Judgment Entry of the Tuscarawas County Court of Common Pleas.

<u>STATEMENT OF THE FACTS AND CASE</u>

{¶2}  In 2005, appellant William Wallick sold his house to Gary Greig. At the time, appellant had owned the house for approximately 25 years. Prior to purchasing the house in July 2005 for $165,000.00, Greig had viewed it either two or three times and "probably looked at the basement twice." Trial Transcript at 73.  Greig testified that "there was nice white dry all on every part of that basement. And the floor was like glossy. I see where she [his real estate agent] meant that you could've ate off the floor. I mean it looked perfect." Trial Transcript at 73.

{¶3}  Greig testified that he reviewed the Residential Property Disclosure Form in deciding to purchase the house. He testified that he remembered reviewing the form, which had been signed by appellant on May 2, 2005, because it indicated that the roof was only two years old.  Appellant checked "No" on the Residential Property Disclosure Form in response to the following questions:

{¶4}  "D) WATER INTRUSION: Do you know of any previous or current water leakage, water accumulation, excess moisture or other defects to the property, including but not limited to any area below grade, basement, or crawl space?...

{¶5}  "E) STRUCTURAL COMPONENTS (FOUNDATION, BASEMENT/CRAWL SPACE, FLOORS, INTERIOR AND EXTERIOR WALLS): Do you know of any movement, shifting, deterioration, material cracks/settling (other than visible minor

cracks or blemishes) or other material problems with the foundation, basement/crawl space, floors, or interior/exterior walls?"

{¶6} Greig further testified that he had a home inspection done. The inspection report stated that it made no representations as to the condition of the basement walls because they were covered with dry wall.

{¶7} Greig moved into the house in October of 2005. He testified that he first noticed water problems in the basement in the early spring of 2006. According to Greig, the east basement wall was leaking water. He testified that he cleaned up the water and waited to see if it would recur and that it did. Greig testified that he next checked the gutters, downspouts and drains to make sure that they were not clogged and functioned properly. However, the problem continued to get worse.

{¶8} In mid-2008, Greig contacted Pioneer Basement Solutions which recommended an exterior waterproofing system. When Pioneer tore out the drywall, it was discovered that the east wall was moderately bowed. Greig testified that the bow "went the entire length of the wall" and that there were big cracks in the wall. He also testified that the insulation that had been removed by Pioneer was moldy and had mildew and that there was mold on the drywall. Greig testified that he had a fortress stabilization system put in at Pioneer's recommendation. Trial Transcript at 84.

{¶9} Jerry Whitaker, who was employed by Pioneer at the time, testified that there was mold on the front of the drywall and that, when the drywall was removed, there were fractures and cracks in the wall and several layers of caulking had been applied to the cracks. The following testimony was adduced when Whitaker was questioned about the cracks:

**{¶10}** "A. Yeah, there was some bowing to the wall where the fracture had - - where the soil had started to push that fracture in.

**{¶11}** "Q. Okay. And let's first talk about the bowing. How would you describe the bowing of the wall?

**{¶12}** "A. It was moderate. I wouldn't say it was too far gone and I suggested we could arrest it, the situation, so it wouldn't bow anymore.

**{¶13}** "Q. Okay. And then let's talk about the fractures or the cracks in the wall. What did you observe regarding those?

**{¶14}** "A. They were - -

**{¶15}** "Q. And let me be more specific. How big were they?

**{¶16}** "A. They were very - - some were hairline cracks, some were as big as a half inch to three quarters to an inch. Maybe stick your, you know, the tip of your finger in some cracks. Some were horizontal, some were the stair stepping type of cracks. Just pretty typical but not safe.

**{¶17}** "Q. Okay. And how long were these cracks?

**{¶18}** "A. They started out in the corner and from what we could tell they covered the whole length of the wall up to if I remember right, it was forty feet, the whole length of the rear wall.

**{¶19}** "Q. So pretty long.

**{¶20}** "A. Yeah, pretty long.

**{¶21}** "Q. You talked about a crack that was half an inch wide. Was there caulking in that crack?

**{¶22}** "A. Yeah, there was.

**{¶23}** "Q. And there were multiple layers of caulking in it?

**{¶24}** "A. The caulking was there and had pulled away from where they originally put it on so that told me that this wall was in fact moving. Whoever put the caulking there from that point it had moved so had stretched and pulled away from it. That's when at that point I told Mr. Greig you might want to, you know, think about arresting the wall, keep it from moving anymore.

**{¶25}** "Q. So what you observed regarding the wall with the cracks and the bowing, was that something that you could just leave alone and let it be?

**{¶26}** "A. I couldn't do it with good conscience, no. That's why I strongly recommended to him to take a look at it and it needs to be corrected.

**{¶27}** "Q. And what did you recommend to him be done?

**{¶28}** "A. We recommended the fortress grid straps on that wall to keep it from moving any further.

**{¶29}** "Q. The caulking that you discovered, was it the same color or different colors?

**{¶30}** "A. There were shades of white, some kind of a yellowish. I don't know if somebody couldn't buy the whole one consistent color or if they were just different layers over time." Trial Transcript at 38-39.

**{¶31}** Whitaker further testified that the caulking that was in the cracks and at the base of the wall indicated that someone was trying to stop the water problem. He testified that there were layers of caulking. Whitaker testified that the leaking in the basement was caused by clogged footer drains on the exterior of the house that caused water to build up on the outside of the house. According to Whitaker, the soil then

became heavier over time and caused the wall to bow and crack. He also testified that a bowed wall should be fixed even if it were bowed a little bit. When asked, Whitaker opined that the wall was significantly bowed and cracked when the house was sold to Greig in August of 2005 and that the basement wall leaked at that point in time. Whitaker testified that twelve fortress strips were used to stabilize the wall at a cost of $400.00 a piece to install and that Greig needed two additional fortress strips installed. In order to install the exterior drainage system, Pioneer had to remove some landscaping around Greig's house.

{¶32} On April 15, 2009, Greig filed a complaint against appellant for fraudulent misrepresentation and concealment and negligent misrepresentation. Greig, in his complaint, sought punitive damages. A bench trial was held on July 13, 2010.

{¶33} As memorialized in a Judgment Entry filed on August 24, 2010, the trial court found that Greig had proven, by a preponderance of the evidence, all of the elements of the claims of fraudulent concealment and fraudulent misrepresentation. The trial court granted Greig[1] judgment against appellant in the amount of $72,244.50. Of this amount, $42,244.50 was for economic damages, $15,000.00 was for noneconomic damages and $15,000.00 was for punitive damages.

{¶34} Of the $42,244.50, $14,720.00 was for past economic damages and $27,524.50 was for future economic damages. Of the $14,720.00, $9,635.00 was for installation of an exterior drainage system and footer drains by Pioneer, $5,000.00 was for installation of twelve fortress footer straps, and $85.00 was for obtaining a mold estimate. The $27,524.50 in future economic damages can be broken down as follows:

---

[1] After Greig died, Carol Greig, the Executrix for the Estate of Gary Greig, was substituted as appellee in this case.

**{¶35}** Move electrical box to install two additional Fortress straps - $585.00

**{¶36}** Installation of two additional Fortress straps - $800.00

**{¶37}** Replace drywall and studs - $995.00

**{¶38}** Repair and replace landscaping to original - $1,597.50

**{¶39}** Mold clean up - $3,547.00

**{¶40}** Decreased value of property with bowed, cracked wall - $20,000.00.

**{¶41}** Appellant now raises the following assignments of error on appeal:

**{¶42}** "I. THE COURT'S AWARD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶43}** "II. THE TRIAL COURT ERRED IN ALLOWING TESTIMONY RELATED TO MENTAL ANGUISH AND AWARDING COMPENSATION BASED ON THAT TESTIMONY.

**{¶44}** "III. THE TRIAL COURT ERRED IN DETERMINING DAMAGES.

**{¶45}** "IV. THE TRIAL COURT ERRED IN AWARDING PUNITIVE DAMAGES."

I

**{¶46}** Appellant, in his first assignment of error, argues that the trial court's judgment finding that Greig had proven, by a preponderance of the evidence, all of the elements of the claims of fraudulent concealment and fraudulent misrepresentation was against the manifest weight of the evidence. We disagree.

**{¶47}** In applying the manifest weight standard of review, our role is to determine whether there is relevant, competent and credible evidence upon which a fact finder could base its judgment. *Cross Truck v. Jeffries*, 5th Dist. No. CA-5758, 1982 WL 2911, (Feb. 10, 2982). Judgments supported by some competent, credible evidence going to

all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279, 281, 376 N.E.2d 578, (1978).

**{¶48}** As stated above, the trial court found that appellant's conduct constituted a fraudulent misrepresentation. To prove fraud, a plaintiff must show that there was: (a) a representation, or where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying on it, (e) justifiable reliance upon the representation or concealment, and (f) resulting injury proximately caused by the reliance. *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101, (1986), paragraph two of the syllabus.

**{¶49}** As is stated above, appellee, in his complaint, alleged that appellant fraudulently concealed that the exterior basement wall was bowed and cracked and also fraudulently concealed that the wall was or had been leaking water.

**{¶50}** Appellant checked "No" on the Residential Property Disclosure Form in response to the following questions:

**{¶51}** "D) WATER INTRUSION: Do you know of any previous or current water leakage, water accumulation, excess moisture or other defects to the property, including but not limited to any area below grade, basement, or crawl space?...

**{¶52}** "E) STRUCTURAL COMPONENTS (FOUNDATION, BASEMENT/CRAWL SPACE, FLOORS, INTERIOR AND EXTERIOR WALLS): Do you know of any movement, shifting, deterioration, material cracks/settling (other than visible minor

cracks or blemishes) or other material problems with the foundation, basement/crawl space, floors, or interior/exterior walls?"

**{¶53}** Greig testified that he reviewed the same and, at trial, Paula Jane Sulzener, his real estate agent, testified that there was no reason to believe that she did not go over the disclosure form with Greig because that was her normal practice.

**{¶54}** At the bench trial in this matter, parts of appellant's deposition testimony were read into the record because appellant was not present at the trial. Appellant, during his deposition, testified that the east wall was bowed when he bought the house in 1980. Appellant testified that he dry walled the basement, but that he did not intend to sell the house when he put up the drywall. Appellant testified that he decided to have the basement dry walled because "[t]hat was the only thing on my list of things I wanted to do to the house…That was the last item on the list to finish up…" Trial Transcript at 19-20. He also denied putting caulk on the east wall. When asked whether he had the house on the market prior to doing the basement dry walling, appellant stated "absolutely not." Trial Transcript at 21.

**{¶55}** At the bench trial, Jodi Bambeck testified that she worked with Cathy Petro at Remax Experts Realty (now Experts Realty) in 2004. Bambeck testified that Exhibit 3, a Residential Agent Synopsis Report, showed that the subject house was listed on June 17, 2004 with Petro, but did not sell. The listing expired in December of 2004. She further testified that Exhibit 4, also a Residential Agent Synopsis Report, showed that Jeff Mathias listed the same property for sale on May 3, 2005 and sold it on July 29, 2005 to Greig. Bambeck testified that both exhibits were true and accurate copies of what was available on the Multiple Listing Service.

{¶56} At the bench trial, Bambeck further testified that Exhibit 20, a photograph, was taken in 2004. According to Bambeck, the picture showed what the basement looked like in June of 2004 when Petro first listed the property. She testified that the picture was a true and accurate picture kept in the ordinary course and scope of Expert Realty's business. The picture shows that the east basement wall was not drywalled at the time of the first listing.

{¶57} Based on the foregoing, we find that there was competent, credible evidence supporting the  trial court's finding that appellant knew of the defective basement wall and fraudulently concealed and/or failed to disclose the same.

{¶58} Appellant's first assignment of error is, therefore, overruled.

II

{¶59} Appellant, in his second assignment of error, argues that the trial court erred in awarding Greig $15,000.00 for mental anguish. Appellant specifically contends that appellee presented no expert testimony to support such claim.

{¶60} A reviewing court will not reverse a trial court's decision regarding its determination of damages absent an abuse of discretion. *Kaufman v. Byers,* 159 Ohio App.3d 238, 2004-Ohio-6346, 823 N.E.2d 520, (11th Dist.) ¶37.  In order to find abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140, (1983).

{¶61} We note that expert testimony is not required to support an award of damages for mental anguish. See, for example, *Leforge v. Nationwide Mut. Ins. Co.*, 82 Ohio App.3d 692, 612 N.E.2d 1318, (12th Dist. 1992).   In *LeForge*, insureds brought an

action against their insurer for breach of contract and bad faith after their insurer rejected their claim for fire loss on grounds that the insureds had intentionally caused the fire. The insureds sought compensation for the mental anguish and inconvenience caused by the lack of insurance benefits. After the trial, the insurer, on appeal, argued that the insureds' self-serving testimony about stress and inconvenience without corroboration through expert testimony was insufficient to prove damages. The court disagreed, stating, in relevant part, as follows: "in the present case it was within the common knowledge of the jury that the LeForges would suffer mental anguish as a result of losing all of their possessions, suffering financial problems, living in unsuitable housing, having their van and boat repossessed, and working multiple jobs. The LeForges offered the same type of proof on mental anguish and inconvenience as would a personal injury plaintiff seeking compensation for pain and suffering." Id at 701.

{¶62} In the case sub judice, it was within common knowledge that Greig would suffer mental anguish caused by the defects and water in his basement. At the trial, he testified as follows when asked how the discovery of the bowed wall affected his life:

{¶63} "A. The way it's affected me is, you know, I waited a long time to buy a house and I - - you know, I saved, I invested, I sacrificed and I did everything I could to make sure that I looked for defects and I didn't see any because they were covered. And it's - - I'll tell you the truth. It's affected my trust in people, it's affected me emotionally because, you know, I'm not a rich person, and you know, I didn't go to the hilt on it but I don't have a lot of room here to start taking care of things like this. And when I relied upon that representation and now I have this yet - - I had to take out a loan, I have to pay interest on the loan, in addition to my house payment, in addition to

all the other normal things that you take care of in a house.  So it's strapped me financially, it's put a burden on me as far as stress, and it's (sic) just destroyed my - - it really has - - it's destroyed my trust.

**{¶64}** "Q. And what is your home to you?  What's the importance of your home to you?

**{¶65}** "A. Well, to me it's like - - it's independence and – I'm sorry, but it does affect me - -."  Trial Transcript at 105-106.

**{¶66}** Based on the foregoing, we find that expert testimony was not required to establish damages for mental anguish and that the trial court's decision to award Greig $15,000.00 for the same was not arbitrary, unconscionable or unreasonable.

**{¶67}** Appellant's second assignment of error is, therefore, overruled.

III

**{¶68}** Appellant, in his third assignment of error, argues that the trial court erred in awarding Greig $27,524.50 in future economic damages and $14,635.00 (paid to Pioneer) in past economic damages.

**{¶69}** As is stated above, an abuse of discretion standard applies. See *Kaufman*, supra.  Thus, we must whether the trial court's decision was unreasonable, arbitrary or unconscionable. See *Blakemore*, supra.

**{¶70}** Appellant initially contends that Exhibits 10-13 should not have been admitted, over objection, because they constituted hearsay. Exhibit 10 is a November 18, 2008, handwritten estimate from James in the amount of $995.00 for hanging drywall on the basement wall and replacing studs. Exhibit 11 is a proposal dated October 24, 2008, in the amount of $1,597.50 from Schoenbrun Landscaping, Inc. to

repair and replace landscaping removed during installation for the exterior drainage system. While Exhibit 12 is a November 21, 2008, estimate from Ohms Law Electric in the amount of $585.00 regarding providing labor and materials to move service equipment away from the basement wall to allow for waterproofing, Exhibit 13 is a mold clean up proposal from In-Door Air Quality Consultants in the amount of $3,547.00. No testimony was presented by the persons who prepared the estimates or proposals.

**{¶71}** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Evid.R. 801(C). We find that the estimates constituted hearsay because they were admitted to prove the truth of the matter asserted. See *Noble v. Mandalin*, 104 Ohio App.3d 11, 660 N.E.2d 1231, (11th Dist. 1995). See also *Clanc v. Neeley*, 3rd Dist. No. 8-89-12, 1990 WL 157232 (Oct. 16, 1990). In the case sub judice the estimates were admitted to prove appellee's damages. There was no independent evidence with respect to such damages. We find, therefore, that the trial court erred in awarding appellee $6,724.50 in future economic damages.

**{¶72}** Appellant also argues that the trial court erred in awarding Greig $20,000.00 for the decreased property value of his house when there was no expert testimony supporting such award. At the bench trial, the following testimony was adduced when Greig was asked about how the bowed wall with fortress strips affected the value of his house:

**{¶73}** "A. Well, if you're truthful and you want to sell your house you're going to have to disclose it and if I walk into a house and I can see that wall I'm running away from it. I'm not buying a house with a bowed basement wall and that's my fear. If I don't

take one of those other steps which are costly, I'm going to lose value in that house when I got to sell it.

**{¶74}** "Q. And what is the value that you will lose?

**{¶75}** "A. I'd say about $20,000.00

**{¶76}** "MR. HINIG: No foundation.

**{¶77}** "THE COURT: I'm going to allow him as a homeowner to opine.  Again, the value or the weight to be given Rick is something you'll argue.

**{¶78}** "A. I'd say at least $20,000.00, Judge."  Transcript at 104.

**{¶79}** "Under the owner-opinion rule, an owner of real property, by virtue of his ownership and without qualification as an expert, is competent to testify to his property's fair market value. * * * The rule is based on the presumption that 'the owner of real estate * * * possess[es] sufficient acquaintance with it to estimate the value of the property, and his estimate is therefore received although his knowledge on the subject is not such as would qualify him to testify if he were not the owner.' " (Citations omitted.) *Cincinnati v. Banks*, 143 Ohio App.3d 272, 291, 757 N.E.2d 1205, (1st. dist. 2001). We find, based on the foregoing, that the trial court did not err in awarding Greig $20,000.00 for the diminution in value of his house. The issue of Greig's credibility was clearly a matter for the trial court, as trier of fact.

**{¶80}** Appellant next argues that the trial court erred in awarding Greig a total of $14,635.00 in past economic damages. Of this figure, $9,635.00 was for installation of an exterior drainage system by Pioneer and to repair the footer drains, $5,000.00 was for the installation of twelve fortress straps to repair the bowed wall.

{¶81} Appellant argues that the $9,635.00 was to waterproof the house and repair the footer drains and that "[n]either of these was caused by the crack in the basement wall." With respect to the $5,000.00 to install the fortress straps to repair the bowed wall, appellant maintains that "[t]he clogged drains caused water to accumulate behind the wall which in turn caused the bowing of the wall. None of that was caused by anything that [appellant] had done or even knew about."

{¶82} However, the evidence was clear that appellant knew about the bowed wall and fraudulently concealed and misrepresented the same. There also was testimony that that wall was leaking at least as of August of 2005 when Greig purchased the same and that attempts had been made to remedy the leaking problem by caulking. There were multiple layers of caulking at the base of the basement wall which was drywalled over by appellant.

{¶83} Based on the foregoing, we find that the trial court did not err in awarding Greig the $9,635.00 for installation of an exterior drainage system by Pioneer and for repair of the footer drains and the $5,000.00 for the installation of twelve fortress straps to repair the bowed wall.

{¶84} Appellant's third assignment of error is, therefore, sustained in part and overruled in part.

IV

**{¶85}** Appellant, in his fourth assignment of error, argues that the trial court erred in awarding Greig $15,000.00 in punitive damages.  We disagree.

**{¶86}** The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion, the court's ruling will be upheld. See *Kemp v. Kemp*, 61 Ohio App.3d 671, 2005-Ohio-3120, 831 N.E.2d 1038, (5th Dist.). Ohio law provides that an award of punitive damages is available only upon a finding of actual malice. *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 316, 736 N.E.2d 517, (10th Dist. 1999). Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill  will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty,* 32 Ohio St.3d 334, 512 N.E.2d 1174, (1987), syllabus.

**{¶87}** The trial court, in awarding punitive damages, found that appellant had acted with a conscious disregard for the rights and safety of Greig and that such conscious disregard had a great probability of causing substantial harm. We find that the trial court's decision was not arbitrary, unreasonable or unconscionable in view of the fact that appellant dry walled over the bowed wall to conceal it from prospective buyers and then misrepresented when and why he did so. As is stated above, appellant testified that he dry walled the basement because it was the last item of a list of things that he wanted to do to the house and testified that he did not intend to sell the house when he put up the dry wall.   There was, however, evidence adduced at trial showing

that the east basement was not dry walled at the time appellant's property was first listed in 2004.

**{¶88}** Appellant's fourth assignment of error is, therefore, overruled.

**{¶89}** Accordingly, the judgment of the Tuscarawas County Court of Common Pleas is affirmed in part and reversed and remanded in part.


By: Edwards, J.

Gwin, P.J. and

Wise, J. concur

_____

_____

_____

                              JUDGES

[Cite as *Greig v. Wallick*, 2012-Ohio-77.]

IN THE COURT OF APPEALS FOR TUSCARAWAS COUNTY, OHIO

FIFTH APPELLATE DISTRICT

GARY L. GREIG                          :
                                       :
            Plaintiff-Appellee         :
                                       :
                                       :
                                       :
-vs-                                   :        JUDGMENT ENTRY
                                       :
WILLIAM C. WALLICK                     :
                                       :
            Defendant-Appellant        :        CASE NO. 2010AP090036


        For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed in part and reversed and remanded in part.  Costs assessed 87% to appellant and 13% to appellee.


                                    _____

                                    _____

                                    _____

                                                    JUDGES